IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE |
| v. | ) | |
| | ) | |
| ANTHONY G. POLITO, D.P.M. | ) | |
| | ) | COMPLAINT |
| and | ) | |
| | ) | |
| ANTHONY G. POLITO, D.P.M., INC. | ) | |
| | ) | |
| Defendants. | ) | |

**PRELIMINARY STATEMENT**

1.    Defendants Anthony G. Polito, D.P.M. and Anthony G. Polito, D.P.M., Inc. have knowingly submitted false or fraudulent claims to Medicare for services which were not reimbursable under Medicare in violation of the False Claims Act.  31 U.S.C. § 3729.  As a result of this fraud, the United States, through the Medicare program, has paid Defendants thousands of dollars in Medicare Part B monies to which the Defendants are not entitled.

1

## JURISDICTION AND VENUE

2.    This action is brought by the United States under the False Claims Act, 31 U.S.C. §§ 3729-3733 and at common law.

3.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345.

4.    Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Defendants reside and transact business in this district.

## PARTIES

5.    Plaintiff is the United States of America.  At all times material to this civil action, the Department of Health and Human Services (HHS) was an agency and instrumentality of the Plaintiff United States, and the Centers for Medicare and Medicaid Services (CMS) was the component agency of HHS which administers and supervises the Medicare program.  CMS contracted with a private insurance carrier to receive, adjudicate, process, and pay certain Medicare claims submitted to it by Medicare beneficiaries or providers.

6.    Defendant Anthony G. Polito, D.P.M. (Polito) is an individual residing in Avon Lake, Ohio.  At all times relevant to this complaint, Polito was a licensed practicing doctor of podiatry.

7.    Defendant Anthony G. Polito, D.P.M., Inc. is the corporate entity Polito formed for his podiatry practice.

2

Anthony G. Polito, D.P.M., Inc. has been registered with Ohio since 1992. Polito is the sole incorporator of Anthony G. Polito, D.P.M., Inc. Polito is the agent and registrant of Anthony G. Polito, D.P.M., Inc.

8. Defendants operate office locations in Medina, Westlake, and Independence, Ohio.

### MEDICARE PART B PROGRAM

9. In 1965, Congress enacted Title XVIII of the Social Security Act, commonly known as Medicare. 42 U.S.C. § 1395, et seq.

10. The United States, through HHS and its component agency, CMS, administers the Supplementary Medical Insurance Program for the Aged and Disabled as established in Part B, Title XVIII, of the Social Security Act under 42 U.S.C. § 1395j-1395w (Medicare Part B Program). HHS has delegated the administration of the Medicare Program to CMS.

11. The Medicare Part B Program is a federally subsidized health insurance system for eligible persons. Eligible persons aged sixty-five and older and persons with qualifying disabilities and/or conditions may enroll in the Medicare Part B Program to obtain benefits in return for payments of monthly premiums as established by HHS. The benefits covered by the Medicare Part B Program include medical treatment and services

by physicians under 42 U.S.C. § 1395k(a)(2)(B).  Outpatient

podiatry services are included in Medicare Part B.

12.  Reimbursement for Medicare claims is made by the

United States through HHS.  HHS, through CMS, assigns the task

of paying Part B claims from the Medicare Trust Fund to Medicare

administrative contractors under 42 U.S.C. § 1395u(a).

13.  At all relevant times herein, HHS through CMS,

administered the Medicare Part B Program in the state of Ohio

through Medicare administrative contractors.  Initially, that

contractor was Palmetto Government Benefits Administrators

(Palmetto GBA), and subsequently that contractor was CGS

Administrators, LLC (CGS).  Both Palmetto GBA and CGS reviewed

and approved claims submitted for medical reimbursement by

Medicare providers, including claims Defendants submitted. Both

Palmetto GBA and CGS made payments on those claims which

appeared to be eligible for reimbursement under the Medicare

Part B Program.

14.  Ohio providers claim Medicare Part B reimbursement

from the Medicare contractors pursuant to written provider

agreements.

15.  Defendants signed, or caused to be executed, provider

agreements with the Medicare Program that permitted the

Defendants to submit claims and accept reimbursement.

16.  A provider must sign a Medicare provider agreement to participate in the Medicare Program.

17.  As a condition of participation in the Medicare Program, providers, including the Defendants, agree to be familiar with, and abide by, the Medicare laws, regulations, and reimbursement policies.  Providers are told that the Medicare laws, regulations, and program instructions are available through the Medicare contractor.

18.  The Provider Enrollment Agreement states, "I understand the payment of a claim by Medicare or other federal health care programs is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions . . . ."

19.  The contractor receives, processes, and pays or rejects claims according to Medicare rules, regulations, and procedures.

20.  Medicare only covers, and participating providers agree to only bill for, services that are covered by Medicare that the provider actually renders that are medically necessary to diagnose and treat illness or injury.  42 U.S.C. §§ 1395y(a)(1)(A); 42 C.F.R. § 411.15(k)(1).

21.  A physician who treats a Medicare patient is required to submit a Medicare Health Insurance Claim Form (HCFA Form 1500) or electronic claim to the Medicare contractor, here,

5

Palmetto GBA or CGS.  The contractor then reimburses the physician on behalf of Medicare.

22.  The HCFA Form 1500 requires the physician to certify that "the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision . . . ."  The requirements are the same for claims submitted electronically.

23.  The HCFA Form 1500 contains the following certification: "I certify that the statements on the reverse apply to this bill and are made a part thereof."  The claim form warns providers that "[a]ny person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."  The same certification exists for claims submitted electronically.

24.  At all times relevant herein, Defendants submitted Medicare Part B claims for podiatry services to Palmetto GBA or CGS.  Palmetto GBA or CGS then processed those claims on behalf of Medicare.

25.  As a general rule, Medicare does not provide coverage for routine foot care, including the cutting or removal of corns

or calluses, the trimming of nails, and other routine hygienic
care (preventative maintenance care ordinarily within the realm
of self care), and any service performed in the absence of
localized illness, injury, or symptoms involving the feet.  42
U.S.C. § 1395y(a)(13)(C); 42 C.F.R. § 411.15(l)(1)(i).

    26.  The Medicare Benefit Policy Manual includes exceptions
for when routine foot care will be covered.  Some of these
exceptions are: (1) the presence of a systemic condition
resulting in severe circulatory embarrassment or areas of
diminished sensation in the patient's legs or feet; or
(2) mycotic toenails where there is clinical evidence of mycosis
of the toenail, and either the patient has marked limitation of
ambulation, pain, or secondary infection resulting from the
thickening and dystrophy of the infected toenail plate (for
ambulatory patients), or the patient has pain or secondary
infection resulting from the thickening and dystrophy of the
infected toenail plate (for nonambulatory patients).  Medicare
Benefit Policy Manual ch. 15, Covered Medical and Other Health
Services, § 290, (rev. 2016) https://www.cms.gov/Regulations-
and-Guidance/Guidance/Manuals/downloads/bp102c15.pdf.

    27.  One exception to this general coverage prohibition is
found in National Coverage Determination 70.2.1, which provides
coverage for foot care for patients with diabetic sensory
neuropathy with loss of protective sensation, also referred to

as diabetic peripheral neuropathy.  In order for services to fall within this exception, diabetic sensory neuropathy with loss of protective sensation must "be diagnosed through sensory testing with the 5.07 monofilament using established guidelines," and the diagnosis of diabetic sensory neuropathy with loss of protective sensation "should be established and documented prior to coverage of foot care."  National Coverage Determinations Manual 70.2.1 – Services Provided for the Diagnosis and Treatment of Diabetic Sensory Neuropathy with Loss of Protective Sensation (aka Diabetic Peripheral Neuropathy) (rev. 2015), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/ncd103c1_part1.pdf.

28.  Another exception to the general coverage prohibition is found in a Local Coverage Determination for Routine Foot Care and Debridement of Nails (L31896).  This Local Coverage Determination was in effect from April 30, 2011 through September 30, 2015.  Prior to Local Coverage Determination for Routine Foot Care and Debridement of Nails (L31896) becoming effective, there was no Local Coverage Determination for nail care in Ohio.  Local Coverage Determination for Routine Foot Care and Debridement of Nails (L31896) (2011), http://localcoverage.cms.gov/mcd_archive/pdfs/viewlcd_pdf.asp?lcd_id=31896&lcd_version=18&contractor_id=239.

8

29.  Local Coverage Determination for Routine Foot Care and Debridement of Nails (L31896) provides for coverage of routine foot care when the patient has a systemic disease, such as metabolic, neurologic, or peripheral vascular disease, of sufficient severity that performance of such routine foot care services performed by a nonprofessional person would put the patient at risk (for example, a systemic condition that has resulted in severe circulatory embarrassment or areas of desensitization in the patient's legs or feet).  This local coverage determination has specific documentation requirements, including that the physical findings and services provided must be "precise and specific," the medical documentation must be adequate, including, for the debridement of toenails, a description of each affected toenail, with the color, size, and thickness of each nail documented.  The documentation must also indicate the number of affected nails.  If the CPT code billed is of 11720, then the condition of at least one nail must be documented; if the CPT code billed is 11721, then the condition of at least six nails must be documented.

30.  Local Coverage Determination for Routine Foot Care and Debridement of Nails (L31896) requires that certain physical and clinical findings indicative of severe peripheral involvement be documented and maintained in the patient record in order for routine foot care services to be reimbursable, even where the

patient has a diagnosis sufficient for coverage.  Specifically, the medical record must indicate some combination of Class A, Class B, and Class C findings, as described in the local coverage determination.  A Class A finding is the non-traumatic amputation of the foot or an integral skeletal portion of the foot.  Class B findings are: (1) absent posterior tibial pulse; (2) advanced trophic changes as evidenced by any three of the following: (a) hair growth (increase or decrease), (b) nail changes (thickening), (c) pigmentary changes (discoloring), (d) skin texture (thin, shiny), (e) skin color (rubor or redness); and (3) absent dorsalis pedis pulse.  Class C findings are: (1) claudication; (2) temperature change (cold feet); (3) edema; (4) paresthesias (abnormal spontaneous sensations in the feet); and (5) burning.  Except where the patient has evidence of neuropathy but no vascular impairment, the local coverage determination requires that the physician include a modifier for the CPT code billed for routine foot care.  The modifier indicates which class findings are present in the patient.  A Q7 modifier indicates a Class A finding; a Q8 modifier indicates two Class B findings; a Q9 modifier indicates one Class B finding and two Class C findings.

31.  Local Coverage Determination for Routine Foot Care and Debridement of Nails (L31896) states that a provider may not bill for an evaluation and management service on the same day as

a routine foot care service unless the evaluation and management service is "a significant separately identifiable service, indicated by the use of modifier 25, and documented by medical records."

32.   Local Coverage Determination for Routine Foot Care and Debridement of Nails (L31896) requires that the patient's medical record contain documentation that "fully supports the medical necessity for services" covered by the local coverage determination.  This requirement includes records of relevant medical history, physical examination, results of pertinent diagnostic tests or procedures, documentation of co-existing systemic illness, and support for the diagnosis and indication of severe peripheral involvement.

## FACTS

33.   Defendant Polito has been practicing podiatric medicine since approximately 1990.  He is currently licensed in the state of Ohio.

34.   On or about January 13, 1998, Polito pled guilty to and was convicted of a misdemeanor theft charge in the Cuyahoga County Court of Common Pleas for theft from Medical Mutual of Ohio insurance company.  The guilty plea and conviction stemmed from Polito's improper billing of a debridement procedure using CPT code 11043, instead of the proper CPT code of 11042, which

11

was reimbursed at a lower rate.  Restitution was paid to Medical Mutual in the amount of $80,000.

35.  On or about April 11, 2001, the State Medical Board of Ohio suspended Polito's license for thirty days because of Polito's theft conviction.

36.  As one of the terms of the suspension of his medical license, Polito was required to complete an ethics course.

37.  When patients, including Medicare beneficiaries, arrive at one of Polito's offices to be treated, each much first fill out a form indicating whether his or her toenails are painful.

38.  When patients, including Medicare beneficiaries, are called back to the examination room, they first meet with a staff member, and then with Polito.

39.  After the patient encounter, Polito dictates his medical notes.  Polito includes CPT codes in his dictation.

40.  Staff at Polito's practice told Medicare beneficiaries that Medicare pays for all foot care for beneficiaries over the age of 65.

41.  From 2001 to approximately November 2010, Polito employed a contractor to transcribe his dictation.  The contractor would pick up the tapes from Polito and drop off the tapes with the printed transcribed dictation notes.

42.   From approximately November 2010 to February 2015, Polito dictated office visit notes using a program called MD Pro.  As of February 2015, Polito is using the Dragon Dictation computer program.

43.   After receiving the transcribed dictation, Polito's staff then fills out a form, known as a superbill, with all of the CPT and ICD-9 codes identified by Polito in his notes.

44.   Defendant Anthony G. Polito, D.P.M., Inc. is the entity through which Polito submits claims to Palmetto GBA or CGS for reimbursement by Medicare.  Polito signed the Medicare Provider Agreement on behalf of Anthony G. Polito, D.P.M., Inc.

45.   Anthony G. Polito, D.P.M., Inc. uses Drs. Central Billing, LLC, a Cincinnati-based company, to submit claims to Palmetto GBA or CGS for reimbursement.

46.   Anthony G. Polito, D.P.M., Inc. sends a form, known as a superbill, with certain ICD-9 and CPT codes circled to Drs. Central Billing, LLC.  Drs. Central Billing, LLC uses the provided superbill to fill out a HCFA Form 1500, which is then submitted to Palmetto GBA or CGS.

47.   Drs. Central Billing, LLC does not verify the accuracy or supporting documentation for the codes identified on the superbill.  Clients of Drs. Central Billing, LLC, including Anthony G. Polito, D.P.M., Inc., are aware that it is the

13

responsibility of the provider to properly fill out the superbill and maintain supporting medical records.

48.  By way of example, Defendants caused the submission of, and ultimately received reimbursement from Medicare for, the following claims for which no medical record exists:[1]

| Beneficiary Initials | Date of Service | Total Amount Paid |
|---|---|---|
| G.B. | 3/26/2009 | $59.59 |
| J.M. | 4/18/2009 | $97.37 |
| A.S. | 8/12/2010 | $124.10 |
| J.S. | 8/18/2009 | $125.34 |
| V.S. | 10/14/2010 | $109.02 |
| A.W. | 8/12/2010 | $135.33 |

49.  By way of example, Defendants caused the submission of, and ultimately received reimbursement from Medicare for, the following claims for podiatric services that were not reimbursable:[2]

> a. **Beneficiary G.B.**

50.  Defendants billed for three services on June 21, 2011, using CPT codes 11721 with modifier 59, 11056 with modifiers Q8 and 59, and 99213 with modifier 25.  None of these services are supported by the medical record.

51.  CPT codes 11721 and 11056 are routine foot care codes. In order to be properly billed, the beneficiary must have a

---

[1] A copy of this chart with full beneficiary name will be provided to Defendants.

[2] Defendants will be provided with full names of all of the beneficiaries discussed in this paragraph.

14

systemic condition that is documented in the medical record for the date of service billed.  CPT code 11721 with modifier 59 is properly used for the debridement (cutting) of six or more nails.  CPT code 11056 with modifier 59 is properly used for the cutting of two to four lesions, such as corns or calluses. Modifier Q8 is properly used to indicate two Class B findings, which are listed in Paragraph 34.

52.  The medical record for G.B. does not support a bill for these routine foot care services.  It is unclear whether G.B. has a systemic condition necessitating that a physician perform routine foot care, but even if G.B. does have such a systemic condition, the medical record supports only one Class B and one Class C finding.  Therefore, CPT codes 11721 and 11056 were not properly billed and should not have been paid.

53.  CPT code 99213 with a modifier 25 is properly used where the physician performs an evaluation and management service that is a significant separately identifiable service from the routine foot care service billed.

54.  The medical record for G.B. on June 21, 2011, does not document that Dr. Polito provided a significant separately identifiable evaluation and management service beyond that necessary for the trimming of G.B.'s toenails and calluses. Therefore, CPT code 99213 with modifier 25 was not properly billed and should not have been paid.

15

b. **Beneficiary J.C.**

55.  Defendants billed for three services on November 14, 2013, using CPT codes 11721 with modifier 59, 11056 with modifiers Q8 and 59, and 99213 with modifier 25.  None of these services are supported by the medical record.

56.  CPT codes 11721 and 11056 are routine foot care codes. In order to be properly billed, the beneficiary must have a systemic condition that is documented in the medical record for the date of service billed.  CPT code 11721 with modifier 59 is properly used for the debridement (cutting) of six or more nails.  CPT code 11056 with modifier 59 is properly used for the cutting of two to four lesions, such as corns or calluses. Modifier Q8 is properly used to indicate two Class B findings, which are listed in Paragraph 34.

57.  The medical record for J.C. does not support a bill for these routine foot care services.  It is unclear whether J.C. has a systemic condition necessitating that a physician perform routine foot care, but even if J.C. does have such a systemic condition, the medical record supports only one Class B and one Class C finding.  Therefore, CPT codes 11721 and 11056 were not properly billed and should not have been paid.

58.  CPT code 99213 with a modifier 25 is properly used where the physician performs an evaluation and management

16

service that is a significant separately identifiable service from the routine foot care services billed.

59.  The medical record for J.C. on November 14, 2013, does not document that Dr. Polito provided a significant separately identifiable evaluation and management service beyond that necessary for the trimming of J.C.'s toenails and calluses. Therefore, CPT code 99213 with modifier 25 was not properly billed and should not have been paid.

c. **Beneficiary C.S.**

60.  Defendants billed for three services on September 29, 2009, using CPT codes 11721 with modifier 59, 11056 with modifiers Q8 and 59, and 99213 with modifier 25.  None of these services are supported by the medical record.

61.  CPT codes 11721 and 11056 are routine foot care codes. In order to be properly billed, the beneficiary must have a systemic condition that is documented in the medical record for the date of service billed.  CPT code 11721 with modifier 59 is properly used for the debridement (cutting) of six or more nails.  CPT code 11056 with modifier 59 is properly used for the cutting of two to four lesions, such as corns or calluses.

62.  The medical record for C.S. does not support a bill for these routine foot care services.  The medical record does not document whether C.S. has a systemic condition necessitating that a physician perform routine foot care.  Therefore, CPT

17

codes 11721 and 11056 were not properly billed and should not have been paid.

63. CPT code 99213 with a modifier 25 is properly used where the physician performs an evaluation and management service that is a significant separately identifiable service from the routine foot care services billed.

64. The medical record for C.S. on September 29, 2009, does not document that Dr. Polito provided a significant separately identifiable evaluation and management service beyond that necessary for the trimming of C.S.'s toenails and calluses. Therefore, CPT code 99213 with modifier 25 was not properly billed and should not have been paid.

65. The podiatric services performed by Defendants during the relevant time period and billed to Medicare Part B by Defendants were excluded from coverage under Medicare Part B and thus were not properly payable.

66. Defendants knew or should have known that the aforementioned podiatric services performed during the relevant time period were excluded from coverage under Medicare Part B.

**COUNT I Violation of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(A)**
**(Against Defendant Anthony G. Polito, D.P.M.)**

67. Plaintiff incorporates by reference all preceding paragraphs 1 through 66 of this Complaint as if fully rewritten herein.

68.  By the acts described above, from May 20, 2009 through September 30, 2015, Defendant Anthony G. Polito, D.P.M. knowingly presented, or caused to be presented, false or fraudulent claims through the Medicare Part B Program for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

69.  The United States paid the false or fraudulent claims because of Defendant Anthony G. Polito's acts, and incurred damages as a result.

70.  Pursuant to 31 U.S.C. § 3729(a)(1), Defendant Anthony G. Polito is liable to the United States for three times the amount of all damages sustained by the United States because of Defendant Anthony G. Polito's conduct.

71.  Pursuant to 31 U.S.C. § 3729(a)(1), Defendant Anthony G. Polito is liable to the United States for a civil penalty of not less than $5,500 and not more than $11,000 for each violation of the False Claims Act committed by Defendants.

### COUNT II Violation of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)
### (Against Defendant Anthony G. Polito, D.P.M., Inc.)

72.  Plaintiff incorporates by reference all preceding paragraphs 1 through 71 of this Complaint as if fully rewritten herein.

73.  By the acts described above, Defendant Anthony G. Polito, D.P.M., Inc. from May 20, 2009 through September 30, 2015 knowingly presented, or caused to be presented, false or

19

fraudulent claims through the Medicare Part B Program for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

74.   The United States paid the false or fraudulent claims because of Defendant Anthony G. Polito, D.P.M.'s acts, and incurred damages as a result.

75.   Pursuant to 31 U.S.C. § 3729(a)(1), Defendant Anthony G. Polito, D.P.M., Inc. is liable to the United States for three times the amount of all damages sustained by the United States because of Defendant Anthony G. Polito, D.P.M., Inc.'s conduct.

76.   Pursuant to 31 U.S.C. § 3729(a)(1), Defendant Anthony G. Polito is liable to the United States for a civil penalty of not less than $5,500 and not more than $11,000 for each violation of the False Claims Act committed by Defendants.

### COUNT III Violation of the False Claims Act
### 31 U.S.C. § 3729 (a)(1)(B)
### (Against Anthony G. Polito, D.P.M.)

77.   Plaintiff incorporates by reference all preceding paragraphs 1 through 76 of this Complaint as if fully rewritten herein.

78.   By the acts described above,Defendant Anthony G. Polito, D.P.M., from May 20, 2009 through September 30, 2015, knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, as defined in 31 U.S.C. § 3729(b)(2), in violation of 31 U.S.C. § 3729(a)(1)(B).

79.   The United States paid the false or fraudulent claims because of Defendant Anthony G. Polito's acts, and incurred damages as a result.

80.   Pursuant to 31 U.S.C. § 3729(a)(1), Defendant Anthony G. Polito is liable to the United States for three times the amount of all damages sustained by the United States because of Anthony G. Polito's conduct.

81.   Pursuant to 31 U.S.C. § 3729(a)(1), Defendant Anthony G. Polito is liable to the United States for a civil penalty of not less than $5,500 and not more than $11,000 for each violation of the False Claims Act committed by Defendant Anthony G. Polito.

**COUNT IV Violation of the False Claims Act**
**31 U.S.C. § 3729 (a)(1)(B)**
**(Against Anthony G. Polito, D.P.M., Inc.)**

82.   Plaintiff incorporates by reference all preceding paragraphs 1 through 81 of this Complaint as if fully rewritten herein.

83.   By the acts described above, Defendant Anthony G. Polito, D.P.M., Inc., from May 20, 2009 through September 30, 2015, knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, as defined in 31 U.S.C. § 3729(b)(2), in violation of 31 U.S.C. § 3729(a)(1)(B).

21

84.  The United States paid the false or fraudulent claims because of Defendant Anthony G, Polito, D.P.M., Inc.'s acts, and incurred damages as a result.

85.  Pursuant to 31 U.S.C. § 3729(a)(1), Defendant Anthony G. Polito, D.P.M., Inc. is liable to the United States for three times the amount of all damages sustained by the United States because of Anthony G. Polito, D.P.M., Inc.'s conduct.

86.  Pursuant to 31 U.S.C. § 3729(a)(1), Defendant Anthony G. Polito, D.P.M., Inc. is liable to the United States for a civil penalty of not less than $5,500 and not more than $11,000 for each violation of the False Claims Act committed by Defendant Anthony G. Polito, D.P.M., Inc.

**COUNT V UNJUST ENRICHMENT**
**(Against Defendant Anthony G. Polito, D.P.M.)**

87.  Plaintiff incorporates by reference preceding paragraphs 1 through 86 of this Complaint as if fully rewritten herein.

88.  From May 20, 2009 through September 30, 2015, the United States paid Defendant Anthony G. Polito, D.P.M. under the Medicare Part B Program for claims which had been submitted for services that were excluded from coverage and thus were not properly payable.

89.  By causing the United States to pay reimbursement for such excluded services, and by the receipt of these payments,

22

Defendant Anthony G. Polito was unjustly enriched to the detriment of the United States in an amount to be determined at trial.

## COUNT VI UNJUST ENRICHMENT
### (Against Defendant Anthony G. Polito, D.P.M., Inc.)

90.  Plaintiff incorporates by reference preceding paragraphs 1 through 89 of this Complaint as if fully rewritten herein.

91.  From May 20, 2009 through September 30, 2015, the United States paid Defendant Anthony G. Polito, D.P.M., Inc. under the Medicare Part B Program for claims which had been submitted for services that were excluded from coverage and thus were not properly payable.

92.  By causing the United States to pay reimbursement for such excluded services, and by the receipt of these payments, Defendant Anthony G. Polito, D.P.M., Inc. was unjustly enriched to the detriment of the United States in an amount to be determined at trial.

## COUNT VII PAYMENT UNDER MISTAKE OF FACT
### (Against Defendant Anthony G. Polito, D.P.M.)

93.  Plaintiff incorporates by reference preceding paragraphs 1 through 92 of this Complaint as if fully rewritten herein.

94.  From May 20, 2009 through September 30, 2015, the United States paid money to Defendant Anthony G. Polito, D.P.M., for services provided under the Medicare Program.

95.  The United States paid Defendant Anthony G. Polito that money based on a mistaken belief that the services provided were covered under the Medicare program.  The United States would not have paid for such claims had it known the true facts.

96.  The United States would not have paid Defendant Anthony G. Polito if the United States had not been mistaken, resulting in damages to the United States in an amount to be determined at trial.

**COUNT VIII PAYMENT UNDER MISTAKE OF FACT**
**(Against Defendant Anthony G. Polito, D.P.M., Inc.)**

97.  Plaintiff incorporates by reference preceding paragraphs 1 through 96 of this Complaint as if fully rewritten herein.

98.  From May 20, 2009 through September 30, 2015, the United States paid money to Defendant Anthony G. Polito, D.P.M., Inc. for services provided under the Medicare Program.

99.  The United States paid Defendant Anthony G. Polito, D.P.M., Inc. that money based upon a mistaken belief that the services provided were covered under the Medicare Program.  The United States would not have paid for such claims had it known the true facts.

24

100. The United States would not have paid Defendant Anthony G. Polito, D.P.M., Inc. if the United States had not been mistaken, resulting in damages to the United States in an amount to be determined at trial.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE**,** Plaintiff demands that judgment be entered in its favor and against Defendants as follows:

a.   On COUNT ONE in the amount of triple Plaintiff's damages plus penalties as allowed by law;

b.   On COUNT TWO in the amount of triple Plaintiff's damages plus penalties as allowed by law;

c.   On COUNT THREE in the amount of triple Plaintiff's damages plus penalties as allowed by law;

d.   On COUNT FOUR in the amount of triple Plaintiff's damages plus penalties as allowed by law;

e.   On COUNT FIVE in the amount of Plaintiff's damages plus prejudgment interest;

f.   On COUNT SIX in the amount of Plaintiff's damages plus prejudgment interest;

g.   On COUNT SEVEN in the amount of Plaintiff's damages plus prejudgment interest;

h.   On COUNT EIGHT in the amount of Plaintiff's damages plus prejudgment interest; and

i.   On ALL COUNTS for the costs of this action,

and such other and further relief to which Plaintiff

may be entitled.

A jury trial is requested.

Respectfully submitted,

CAROLE S. RENDON
Acting United States Attorney

By:  s/ Patricia M. Fitzgerald
Patricia M. Fitzgerald (PA Bar #308973)
Michelle L. Heyer (#0065723)
Assistant U.S. Attorneys
United States Courthouse
801 West Superior Avenue
Suite 400
Cleveland, OH 44113
Phone: (216) 622-3600
Fax: (216) 522-2404
E-Mail: patricia.fitzgerald2@usdoj.gov
michelle.heyer@usdoj.gov

ATTORNEYS FOR THE
UNITED STATES OF AMERICA